UNITED STATES of America

v.

INDIANA HARBOR BELT RAILROAD
COMPANY.

Civ. No. 3336.

United States District Court
N. D. Indiana,
Hammond Division.

Nov. 5, 1963.

Alfred W. Moellering, U. S. Atty., Ford Wayne, Ind., Lester R. Irvin, Asst. U. S. Atty., Hammond, Ind., Richard C. Davis, I. C. C., Washington, D. C., for plaintiff.

George W. Burbach, Crumpacker, Burbach & Abrahamson, Hammond, Ind., for defendant.

BEAMER, District Judge.

The defendant is charged in a Fifteen Count complaint filed under Title 45 U.S.C. §§ 1–16 with violating the Railroad Safety Appliance Act.

The defendant has confessed judgment on all counts except Five and Nine. The Government dismissed Count Five and the parties have submitted Count Nine on an agreed stipulation of facts.

Count Nine involves a charge that GACX covered hopper car 44833 had defective air brakes when it arrived at the Gibson yard in Hammond, Indiana as a part of a New York Central train on March 13, 1962. The stipulation of facts is as follows:

"1. A train of cars, including car No. GACX 44833, which car has a 10½ inch piston travel, arrived at Gibson Yard, Hammond, Indiana, from NYC Western Division at 9:50 A.M. on March 13, 1962.

"2. At Gibson Yards, NYC's locomotives, caboose and crew were removed and IHB locomotives and caboose were connected and manned by an IHB crew, and this train of cars, including car No. GACX 44833, which car had a 10½ inch piston travel, departed Gibson Yard at 10:10 A.M. on March 13, 1962, for delivery to Milwaukee Road at Bensenville, Illinois. This was pursuant to a contract by and between NYC, IHB and Milwaukee Road entered into on July 12, 1961, as supplemented November 1, 1961, which agreement is Exhibit 1.

"3. This train was hauled over tracks, which tracks are regularly used by IHB, with the train under the control of an IHB train dispatcher and under the authority of an IHB timetable and under the jurisdiction and control of an IHB superintendent and at all times operated by an IHB crew.

"4. The tracks over which the aforesaid movement was operated are owned, operated and used as follows: Gibson Yard is owned by the NYC, operated by the IHB, and used by both the NYC and the IHB; the tracks from Gibson Yard to Calumet Park, Illinois, are owned by the NYC and used by both the NYC and IHB; the tracks from Calumet Park to Blue Island are owned by the IHB and used by the IHB and NYC; the tracks from Blue Island to McCook are owned by the B&OCT and used by the IHB and the B&OCT; the tracks from McCook to Franklin Park are owned by the IHB and used by the IHB and the B&OCT; and the tracks from Franklin Park to Bensenville are owned by the Milwaukee Road and used by the Milwaukee Road and the IHB.

"5. Approximately 90% of the cars handled by the IHB which come into Gibson Yard from the NYC western division and destined for the Milwaukee Road are handled under the provisions of the contract Exhibit 1. Cars handled pursuant to the contract are classified at Elkhart, Indiana or points east and delivered by the NYC to Gibson Yard already classified in a solid block. The IHB does not classify the cars at Gibson Yard. Cars are not recorded on IHB accounts as having been interchanged and no per diem is paid by the IHB on such cars, nor does the IHB share in the tariff revenues as an intermediate carrier or appear on the waybill routing.

"Prior to the execution of the contract Exhibit 1, cars received from the NYC destined for the Milwaukee Road were classified at Gibson, recorded there on IHB accounts and the IHB shared in the tariff revenues as an intermediate carrier and appeared on the routing as such."

Exhibit "1" to the stipulation is a contract between the New York Central Railroad Company, Indiana Harbor Belt Railroad Company and the Milwaukee, St. Paul and Pacific Railroad Company, pertaining to the method of handling trains and cars to be interchanged between the NYC and Milwaukee railroads by the IHB. Without setting out the agreement, it provides in effect, insofar as applicable here, that the NYC will deliver cars to the IHB at the Gibson, Indiana yard, intended for interchange to the Milwaukee. IHB will then accept and handle the cars with its own crews, engines and cabooses and make delivery to the Milwaukee at its Bensenville, Illinois yard. NYC agrees to compensate IHB for its services at the rate of $6.00 per car. The NYC agrees to pay IHB for any repairs that the IHB may be required to make to cars handled for NYC and NYC agrees to pay IHB a stipulated amount for switching damaged or repaired cars and further agrees to indemnify and save harmless the IHB from all loss, damages and expense growing out of the work of repairing cars and returning them from the location where they are repaired.

New York Central further agrees that all cars delivered to IHB for handling to the Milwaukee shall remain in the possession of the NYC until delivered by IHB to the Milwaukee at Bensenville and the engine is cut off. It further agrees that for the purpose of determining liability for loss, damage, injury or death, the engines, cabooses and crews while delivering cars for the NYC shall be considered sole trains of the NYC and it indemnifies and holds harmless the IHB for any losses and damages caused during such operations and the trains shall be considered the sole trains of the NYC.

Similar provisions involve the agreement between IHB and Milwaukee pertaining to the interchange of trains and cars from Milwaukee to NYC by IHB.

There are other provisions pertaining to all the parties but they appear irrelevant here.

(The United States charged the NYC with violating the Safety Appliance Act

in a separate action involving the defective brakes on Car No. GACX 44833. The action resulted from an I.C.C. inspector's report on the condition of the car when it arrived as a part of the NYC train at the Gibson Yard on March 13, 1962. The NYC confessed judgment in that case.)

Indiana Harbor Belt contends here that under the stipulated facts, including the agreement between the NYC, IHB and Milwaukee, that the car in question was in the possession and under the control of the NYC, and as such, it was part of the same movement of the NYC from its Elkhart yard where the train was made up for interchange with the Milwaukee at Bensenville, Illinois. Since the NYC was charged with a violation because of this defective car in that movement, the IHB contends it cannot be properly charged with the same violation. In short, IHB says it was acting as the NYC's agent in delivering the cars from the Gibson yard to Bensenville, which was part of the greater movement from Elkhart to Bensenville. Because it was the same movement, and IHB was acting as the agent of NYC, it has not violated the Safety Appliance Act.

The defendant relies principally upon the case of Texas & P. Ry. Co. v. United States, 8 Cir., 189 F.2d 749 (1951). There the defendant was charged with a violation because it was hauling defective cars between two points in the joint freight and terminal yards of the defendant and the Missouri-Pacific Railroad Company in Texarkana. The cars had been brought into the jointly operated yard by Missouri-Pacific. They were inspected and found to be defective. The repairs could not be made at the point where the defects were found and the nearest repair point maintained by Missouri-Pacific was 64 miles distant. Approximately 3000 feet from the point of inspection and detection of the defects the defendant had facilities for making repairs. The cars were moved to the repair shop and were repaired. As in the present case, there was an agreement between the two railroads pertaining to joint facilities and movements, making the railroad company moving cars of the other within the facility the agent of the latter. Pursuant to the agreement, the defendant had moved the defective cars from the point of inspection to the point where repairs were made. (It should be added that under the contract the employees in the yard were paid by the defendant who in time was reimbursed for its proportionate share of their services by the Missouri-Pacific in accordance with an agreed upon formula.) The Court there held that the defendant was not liable because the movement of the defective cars was by the Missouri-Pacific within the meaning of the Safety Appliance Act.

The plaintiff relies upon the later case of United States v. Houston Belt & Terminal Ry. Co., 5 Cir., 210 F.2d 421 (1954). This case involved three defective cars which the defendant handled for the St. Louis, Brownsville and Mexico Railroad Company. The first was moved in the yard by the defendant and later left the yard in an International Great Northern train. The other two were moved by the defendant to a repair track for repair, the movement having been made by the defendant's crew and engine. The trial court found the movement of the first car to be a violation, but on the basis of Texas & P. Ry. Co. v. United States supra, held that the defendant had not violated the Safety Appliance Act by moving the other cars to the repair track. There, as here and as in Texas & P. Ry. Co. the defendant relied upon an operating agreement under which it acted as the agent of the St. Louis, Brownsville and Mexico Ry. Co.

The Court of Appeals, after pointing out some distinctions in the two contracts said:

"There can be no question that under the terms of the statute and the well settled jurisprudence concerning it the hauling of the car involved in the first cause of action constituted a violation of the Act.

**222**

This car was moved and proceeded only in interchange. Manifestly, a common carrier, as Belt concededly is, cannot, in effecting interchange, haul defective cars and claim immunity by reason of any agency claim or contract."

Interestingly, the Court of Appeals held the defendant also liable for the movement of the other two cars to the repair track. We are not concerned with this movement however, because there is no claim that the IHB was moving the defective car to the repair track. It is stipulated that the IHB was in the process of taking the car as a part of a train to be interchanged to the Milwaukee at Bensenville. It could not be exempt under the movement of defective cars proviso of Title 45 Section 13.

I agree with the reasoning of the Court in Houston Belt, supra, that a common carrier cannot, in effecting interchange, claim immunity for hauling defective cars under an agency contract.

The Safety Appliance Act is aimed at common carriers and imposes certain duties upon all carriers in the interest of public safety. The IHB is a common carrier even though it may be acting at the moment under an agency agreement. The duty of a common carrier to refrain from hauling a defective car is absolute and generally cannot be avoided by means of agency agreements. United States v. Houston Belt, supra, 210 F.2d at page 425 and cases cited in Note 7. The fact that the defendant took the defective car from NYC as a part of a train to be delivered to the Milwaukee at Bensenville as a unit under an agency agreement does not, in my opinion, create an exception to the general rule which would relieve the defendant from penalty for violation of the act. As stated in the Houston Belt case, supra, 210 F.2d at page 425:

"This remedial statute is to be liberally construed to effectuate its humanitarian purpose to protect the lives and limbs of those engaged in the hazardous operation of railroading and the safety of the public generally."

For the foregoing reasons, judgment is entered for the United States and against the Indiana Harbor Belt Railroad Company on Count Nine of the complaint.

This Memorandum shall serve as the Findings of Fact and Conclusions of Law.